## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

INNOVATIVE THERAPIES, INC.,

        Plaintiff,

    v.

KINETIC CONCEPTS, INC., KCI
LICENSING, INC. and KCI USA, INC.

        Defendants.

Civil Action No. 07-589-SLR-LPS

## PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Dated: April 4, 2008

Thomas H. Kovach (DE Bar #3964)
PARKOWSKI, GUERKE & SWAYZE, P.A.
800 King Street, Suite 203
Wilmington, DE 19801
Telephone: (302) 654-3300

*Attorneys for Plaintiff Innovative Therapies, Inc.*

*Of Counsel*:

Jonathan G. Graves
Erik B. Milch
Justin P.D. Wilcox
Scott Cole
COOLEY GODWARD KRONISH LLP
One Freedom Square
Reston Town Center
11951 Freedom Drive
Reston, Virginia 20190-5656
Telephone: (703) 456-8000
Facsimile: (703) 456-8100

TABLE OF CONTENTS

PAGE

I.     INTRODUCTION ................................................................................................ 1

II.    STATEMENT OF FACTS .................................................................................. 2

       A.    Innovative Therapies Develops a New, Affordable Negative Pressure
             Wound Therapy Device To Aid Non-Healing, Chronic Wounds........................ 2

       B.    Innovative Therapies Receives FDA Approval and Offers the Svedman™
             System for Sale ................................................................................................ 3

       C.    KCI Seeks to Block From the Market Any Alternative Negative Pressure
             Wound Therapy Device That Would Compete With Its V.A.C.® Device............ 4

       D.    KCI Makes Clear That It Will Aggressively Assert Its Intellectual
             Property Rights Against Innovative Therapies ..................................................... 5

             1.    September 12, 2007 Call with KCI's Director of Marketing,
                   Michael Girouard ...................................................................................... 6

             2.    September 17, 2007 Call with KCI's Senior Vice President of
                   Manufacturing, Michael Burke ................................................................. 6

       E.    This Declaratory Judgment Action and KCI's Later-filed Actions in Texas
             and North Carolina.......................................................................................... 7

III.   ARGUMENT..................................................................................................... 10

       A.    The Legal Standard for Declaratory Judgment Subject Matter Jurisdiction........ 11

       B.    "All the Circumstances" Demonstrate An "Actual Controversy" Between
             the Parties....................................................................................................... 13

             1.    Key KCI Decision-Makers Made Clear That KCI Would Sue
                   Innovative Therapies................................................................................. 13

             2.    The Federal Circuit's Recent Decision in Micron v. Mosaid
                   Confirms that a Case and Controversy Existed When Innovative
                   Therapies Filed Its Original Complaint .................................................... 17

       C.    The Court Should Decline to Exercise Its Discretion to Dismiss this
             Action Because of the Public Interests Involved in the Treatment of
             Chronic, Non-healing Wounds .......................................................................... 19

       D.    The Court Should Deny KCI's Request to Transfer this Action to the
             Middle District of North Carolina...................................................................... 20

             1.    The Legal Standard for Transfer of Venue ............................................... 20

             2.    The First-Filed Rule Favors Maintaining this Action in this Court......... 21

             3.    The Remaining Applicable Factors Support A Transfer To
                   Innovative Therapies' First-Filed Action In Delaware............................. 23

## TABLE OF CONTENTS
(CONTINUED)

**PAGE**

    E.    Innovative Therapies' Declaration of Ownership Is Properly Before This Court ............................................................................................................... 24

IV.    CONCLUSION........................................................................................................... 25

# TABLE OF AUTHORITIES

**PAGE**

**CASES**

ADE Corp. v. KLA-Tencor Corp.,
138 F. Supp. 2d 565 (D. Del. 2001)........................................................................... 21

Aetna Life Ins. Co. v. Haworth,
300 U.S. 227 (1937)................................................................................................... 12

Bates v. Western Electric,
420 F. Supp. 521 (E.D. Pa. 1976) ............................................................................. 10

Boston Scientific Corp. v. Johnson & Johnson Inc.,
532 F. Supp. 2d 648 (D. Del. 2008)..................................................................... 21, 22

C.R. Bard, Inc. v. Guidant Corp.,
997 F. Supp. 556 (D. Del. 1998)................................................................................ 22

Carney v. Resolution Trust Corp.,
19 F.3d 950 (5th Cir. 1994) ....................................................................................... 10

Crutchfield New Media, LLC v. Charles E. Hill & Associates, Inc.,
2007 WL 1320750, at *2 (S.D. Ind. May 4, 2007) ................................................... 19

Davis v. TXO Prod. Corp.,
929 F.2d 1515 (10th Cir. 1991) ................................................................................. 10

Eccles v. Peoples Bank,|
333 U.S. 426 (1948)................................................................................................... 20

Echostar Satellite LLC v. Finisar Corp.,
515 F. Supp. 2d 447 (D. Del. 2007)........................................................................... 20

Genentech v. Eli Lilly & Co.,
998 F.2d 931 (Fed. Cir. 1993)............................................................................... 20, 21

In re M.L.-Lee Acquisition Fund II, L.P.,
816 F. Supp. 973 (D. Del. 1993)................................................................................ 22

Jordan v. City of Philadelphia,
66 F. Supp. 2d 638 (E.D. Pa. 1999) ........................................................................... 10

Jumara v. State Farm Ins. Co.,
55 F.3d 873 (3d Cir. 1995).......................................................................................... 21

Kinetic Concepts, Inc, et al. v. Medela AG,
No. 07-187 (E.D. Tex. filed May 15, 2007) ................................................................ 4

Kinetic Concepts, Inc. v. Botsford Gen. Hosp.,
No. 03-70135 (E.D. Mich.)........................................................................................... 5

Kinetic Concepts, Inc. v. Med. Ctr. of La. at New Orleans,
No. 01-2950 (E.D. La.) ................................................................................................. 5

Kinetic Concepts, Inc., et al. v. Bluesky Med. Corp.,
No. 03-832, 2007 WL 1113002 (W.D. Tex. Apr. 4, 2007) .......................................... 4

Kinetic Concepts, Inc., et al. v. Innovative Therapies, Inc., et al.,
No. 2008-CI-00026 (Tex. Dist. Ct., Bexar Cty. filed Jan. 2, 2008)............................. 8

Maryland Casualty Co. v. Pacific Coal & Oil Co.,
312 U.S. 270 (1941)................................................................................................... 12

# TABLE OF AUTHORITIES
### (CONTINUED)

**PAGE**

*MedImmune, Inc. v. Genentech, Inc.*,
127 S.Ct. 764 (2007)........................................................................ 1, 12, 13, 16, 19
*Micron Tech., Inc. v. Mosaid Techs., Inc.*,
-- F.3d --, 2008 WL 540182 (Fed. Cir. Feb. 29, 2008)................................. 18, 19, 21
*Monolithic Power Sys. v. O2 Micro Int'l Ltd.*,
No. 07-2363, 2007 WL 2318924, at *3 (N.D. Cal. Aug. 13, 2007) ........................ 13
*Oracle Corp. v. epicRealm Licensing, L.P.*,
No. 06-414-SLR, 2007WL 901543, at *8 (D. Del. Mar. 26, 2007) ................... 21, 22
*Proven Methods Seminars, LLC v. Am. Grants & Affordable Housing Inst., LLC*,
519 F. Supp. 2d 1057 (E.D. Cal. 2007).................................................................. 10
*Rimmax Wheels LLC v. RC Components, Inc.*,
No. 06-029-SLR, 2007 WL 121772, *3 (D. Del. Jan. 10, 2007)........................... 25
*SanDisk Corp. v. STMicroelectronics, Inc.*,
480 F.3d 1372 (Fed. Cir. 2007)............................................................................ 19
*Sherwood Med. Indus., Inc. v. Deknatel, Inc.*,
512 F.2d 724 (8th Cir. 1975) ............................................................................... 15
*Snyder v. Pascack Valley Hosp.*,
303 F.3d 271 (3rd Cir. 2002) ............................................................................... 10
*Teva Pharms. USA, Inc. v. Novartis Pharms. Corp.*,
482 F.3d 1330 (Fed. Cir. 2007)....................................................................... 12, 13
*Van Dusen v. Barrack*,
376 U.S. 612 (1964).......................................................................................... 22
*Wake Forest University Health Sciences v. Innovative Therapies, Inc.*,
No. 1:08-cv-32 (M.D.N.C. filed Jan. 10, 2008)....................................................... 9
*Walter Kidde Portable Equip., Inc. v. Univ. Sec. Instr., Inc.*,
304 F. Supp. 2d 769 (M.D.N.C. 2004) ............................................................ 22, 24
*Zito v. Steeplechase Films, Inc.*,
267 F. Supp. 2d 1022 (N.D. Cal. 2003) ................................................................ 10

**OTHER AUTHORITIES**
6 C. Wright, A. Miller & M. Kane,
FEDERAL PRACTICE & PROCEDURE § 1476, at 556-57 (2d ed. 1990) ...................... 10
Federal Court Management Statistics, U.S. District Courts,
http://www.uscourts.gov/caseload2007/tables/C00Mar07.pdf (last visited on Mar. 7, 2008) . 24
Wright & Miller, 10B FEDERAL PRACTICE & PROCEDURE § 2751 ........................ 14, 16

I.    **INTRODUCTION**

In seeking dismissal of this action, Defendants Kinetic Concepts, Inc., KCI Licensing,

Inc., and KCI USA, Inc. (collectively, "KCI") accuse Plaintiff Innovative Therapies, Inc.

("Innovative Therapies") of "gamesmanship," "forum shopping," and "wast[ing] valuable

resources" of the Court.  In fact, however, it is KCI that has effectively stalled this action for

more than six months, while at the same time filing multiple litigations against Innovative

Therapies in state and federal courts and embarking on a campaign to smear Innovative

Therapies and its competing product—the Svedman™ system.  On January 2, 2008, KCI filed a

Texas state court action for trade secret misappropriation against Innovative Therapies and three

of its corporate officers in their individual capacity, seeking, *inter alia*, a declaration of

ownership of the Svedman™ system and all related intellectual property.  One week later, KCI

filed a patent infringement suit in federal court in North Carolina, accusing Innovative Therapies

of infringing three of the five patents at issue in this case.

In this matter, KCI withdrew its first motion to dismiss as moot due to the filing of

Innovative Therapies' First Amended Complaint.  After demanding a thirty day extension to

assess how it would respond to the new complaint, KCI again filed a motion to dismiss that

regurgitates the arguments from its first motion and erroneously contends that the Court should

disregard the Amended Complaint.  Apparently cognizant of the weakness of its arguments

regarding lack of subject matter jurisdiction, KCI alternatively requests transfer of this first-filed

action to the Middle District of North Carolina.

"All the circumstances" surrounding the launch of the Svedman™ system demonstrate

the existence of a case or controversy sufficient to confer subject matter jurisdiction over this

action, both at the time of the filing of the original Complaint and the First Amended Complaint.

*See MedImmune, Inc. v. Genentech, Inc*., 127 S. Ct. 764, 771 (2007).  First, KCI had rebuffed

Innovative Therapies' pre-suit attempts to form a business relationship.  Second, after learning of

the properties of the Svedman™ system, a Senior Vice President and member of KCI's

Executive Committee stated that the odds were "100 percent" that KCI would sue Innovative

Therapies for patent infringement. Third, KCI has sued every competitor that has dared to sell commercially viable negative pressure wound therapy devices. Fourth, as predicted by ITI's declaratory judgment action and its briefing in opposition to KCI's first motion to dismiss, KCI did initiate litigation—in fact, two litigations—against Innovative Therapies. Finally, Innovative Therapies' Lanham Act claim—which is based on false and misleading statements by KCI representatives after the filing of the original Complaint—provides an additional, independent basis for subject matter jurisdiction in this action.

Moreover, the very immediate and substantial disputes between the parties should be litigated in this forum, not the Middle District of North Carolina. Innovative Therapies' choice to file in Delaware—where it and two of the KCI defendants are incorporated—is entitled to substantial deference, and KCI's moving papers fall well short of establishing that the balance of convenience of the parties and witnesses strongly favors transfer to the site of its later-filed infringement action.

## II.    STATEMENT OF FACTS

### A.    Innovative Therapies Develops a New, Affordable Negative Pressure Wound Therapy Device To Aid Non-Healing, Chronic Wounds.

Mr. Richard Vogel, a former KCI Vice President and Executive Committee Member, recognized a critical need for an affordable alternative to KCI's patented Vacuum Assisted Closure (V.A.C.®) device and searched for an alternative foundation for a wound therapy device. Declaration of Richard Vogel ¶¶ 2, 7, 8 ("Vogel Decl."). After locating the negative wound pressure therapy work and prior art of Dr. Paul Svedman, Vogel partnered with Dr. Svedman—a plastic and reconstructive surgeon, prolific inventor, and professor of medicine— and several other individuals to found Innovative Therapies to research, develop, and produce innovative therapies in the field of patient wound care. *Id.* ¶¶ 1, 10, 11. Because many health care facilities (such as nursing homes) cannot afford the significant cost of the V.A.C.®, which prevents thousands of patients in the United States from receiving the negative pressure wound therapy necessary to heal their chronic wounds, and in many cases, avoid amputation, Innovative Therapies set out to meet the needs of that under-serviced market by developing a more cost

accessible negative pressure wound therapy system based upon Dr. Svedman's pioneering work in the late 1970s and early 1980s.  *See id.* ¶¶ 7, 8, 11-12.

Innovative Therapies' development efforts led to a new and improved negative pressure wound therapy device named the Svedman™ system.  *Id.* ¶ 13.  The Svedman™ system provides wound therapy that is as effective as KCI's V.A.C.® device, but is easier to use and more cost accessible than the V.A.C.® and other competitive products currently on the market.  *Id.* ¶¶ 14, 19.  The Svedman™ system promotes wound healing by facilitating wound drainage through the combination of negative pressure (*i.e.*, suction) and irrigation.  *Id.* ¶ 13.  Because Innovative Therapies can offer the Svedman™ system at a substantial discount to the current market price for competitive products, rentals and sales of such devices to customers previously priced out of the market become feasible, thus enabling a greater number of patients with serious wounds to benefit from faster and more comfortable periods of healing.  *Id.* ¶ 14.

**B.**   **Innovative Therapies Receives FDA Approval and Offers the Svedman™ System for Sale.**

The Food and Drug Administration ("FDA") approved both of Innovative Therapies' 510(k) submissions relating to the Svedman™ system.  *Id.* ¶ 16; *see also* Ex. A to Declaration of David Tumey ("Tumey Decl.") (appending Innovative Therapies' 510(k) summaries and clearances).  Those submissions took advantage of a FDA procedure that streamlines the approval process by allowing an applicant to claim that its new medical device "has essentially the same technological characteristics" as a previously approved device, or "predicate device" in FDA lexicon.  One of Innovative Therapies' 510(k) submissions identified a device called the "ANTLIA I Wound Irrigation System" that involved the application of negative pressure in combination with irrigation to promote wound healing.  Vogel Decl. ¶ 17.  Innovative Therapies claimed KCI's V.A.C.® as a predicate device, asserting that the ANTLIA I "has essentially the same technological characteristics as the previously cleared predicate device."  *Id.*  The other 510(k) identified a device called the "ANTLIA II Suction Pump System" that sought wound healing through the application of negative pressure only (without irrigation).  *Id.* ¶ 18.

Innovative Therapies claimed the Medela Invia™ Healing System and the BlueSky Medical Versatile 1™ Wound Vacuum System—both accused of infringement by KCI in *Kinetic Concepts, Inc, et al. v. Medela AG*, No. 07-187 (E.D. Tex. filed May 15, 2007) and *Kinetic Concepts, Inc., et al. v. BlueSky Med. Corp.*, No. 03-832, 2007 WL 1113002 (W.D. Tex. Apr. 4, 2007) ("BlueSky litigation"), respectively—as predicate devices to the ANTLIA II.  *Id.* ¶ 18.

After receiving FDA clearance, Innovative Therapies proceeded to test the Svedman™ system through clinical evaluations in August and September 2007.  *Id.* ¶ 15.  During those evaluations, five patients with chronic wounds were successfully treated and healed by the Svedman™ system.  *Id.*  Indeed, the supervising physician provided testimonials regarding the outstanding chronic wound treatment provided by the Svedman™ system.  *See id*.  As a result of the successful clinical evaluations, Innovative Therapies decided to commercialize and market the Svedman™ system.  Innovative Therapies made its first offer for sale of a Svedman™ system on September 27, 2007, and the first Svedman™ system was placed with a customer in the first week of October 2007.  Am. Compl. ¶ 33.  Innovative Therapies had placed approximately 60 Svedman™ systems as of the filing of the Amended Complaint.  *Id.*

## C.   KCI Seeks to Block From the Market Any Alternative Negative Pressure Wound Therapy Device That Would Compete With Its V.A.C.® Device.

KCI has accumulated a portfolio of patents that it claims cover its V.A.C.® device, including U.S. Patent Nos. 4,969,880 ("the '880 patent")[1], 5,645,081 ("the '081 patent"), 5,636,643 ("the '643 patent"), 7,198,046 ("the '046 patent"), and 7,216,651 ("the '651 patent)[2]— the patents at issue in this declaratory judgment action.[3]  Am. Complaint ¶ 9.  Further, KCI has a history of aggressively asserting its patent portfolio in litigation to limit competition with its

---

[1] KCI is the assignee of the '880 patent.

[2] KCI is an exclusive licensee of the '081, '643, '046, and '651 patents, which are all assigned to Wake Forest University.

[3] *Ex parte* reexamination proceedings with respect to each of the five patents-in-suit are currently ongoing in the United States Patent and Trademark Office (PTO).  Recently, the Examiner issued initial office actions in each of the cases in which he rejected ***all*** of the claims at issue in the reexaminations as anticipated and/or obvious in view of prior art.  The Examiner's rejections are based largely on prior art references disclosing Dr. Svedman's work.

V.A.C.® device.  Indeed, in the past six years, KCI has sued ten defendants in six different lawsuits.  *Id.* ¶ 23.  While KCI attempts to downplay its corporate philosophy of aggressive patent litigation and refusal to license its patents, those KCI lawsuits include both of KCI's primary competitors in the chronic wound care treatment market:  Medela and BlueSky Medical Corp./Smith & Nephew.  Furthermore, KCI has taken its litigation strategy to the extreme of suing a doctor and hospitals that have used negative pressure technology other than KCI's V.A.C.® device to treat patients with chronic wounds.  *See, e.g.*, *Kinetic Concepts, Inc. v. Botsford Gen. Hosp.*, No. 03-70135 (E.D. Mich.) (filed Jan. 10, 2003 against Botsford General Hospital, Tri-County Hospital, and Dr. Robert Colen; subsequently dismissed) (attached as Exhibit A to the Declaration of Jonathan G. Graves ("Graves Decl.")); *Kinetic Concepts, Inc. v. Med. Ctr. of La. at New Orleans*, No. 01-2950 (E.D. La.) (filed Sept. 25, 2001 against the non-profit Medical Center of Louisiana at New Orleans; subsequently dismissed) (attached as Exhibit B to Graves Decl.).

### D.  KCI Makes Clear That It Will Aggressively Assert Its Intellectual Property Rights Against Innovative Therapies.

Prior to offering the Svedman™ system for sale, Vogel and David Tumey—Innovative Therapies' Chief Technology Officer and former KCI New Technologies Director of Research & Development—decided to approach KCI regarding the Svedman™ system.  Vogel and Tumey have first hand experience with KCI's litigation decision-making process and tactics as former KCI employees and officers.[4]  Vogel Decl. ¶¶ 3-6; Tumey Decl. ¶ 4.  Indeed, as Director of Research and Development, Tumey played a significant role in the Blue Sky litigation, assisting counsel by acquiring and reverse engineering the defendant's products.  Tumey Decl. ¶ 4.  Both Vogel and Tumey also have testified as witnesses in litigation involving KCI.  On the eve of their new company's launch of a device that would compete directly with KCI's V.A.C.®, Vogel and Tumey were quite aware from their experience within KCI that they faced the almost certain

---

[4] In addition to his service as a KCI Executive Committee member and Vice President, Mr. Vogel was also General Manager of KCI New Technologies.  David Tumey served as Director of Research and Development for five of his eight years at KCI.

prospect of being the next target of KCI's aggressive litigation tactics.  *Id.* ¶ 5.  Therefore,

Tumey decided to contact some of his old colleagues at KCI to assess the potential for avoiding

litigation by consummating a business relationship between the parties.  *Id.* ¶¶ 6, 16.

### 1.    September 12, 2007 Call with KCI's Director of Marketing, Michael Girouard

Tumey called his former colleague, Michael Girouard, because he believed that, as KCI's

Director of Marketing, Girouard would understand KCI's current institutional attitude toward

patent enforcement against competitive products.  *Id.* ¶ 7.  Also participating in the call was

Mark Meents, another founder of Innovative Therapies and former KCI employee.  Tumey Decl.

¶ 6; Declaration of Mark Meents ¶ 3 ("Meents Decl.").  During the call, Tumey asked Girouard

if he was aware of the two 510(k) submissions filed by Innovative Therapies that the FDA had

recently approved.  Meents Decl. ¶ 4 & Ex. A; Tumey Decl. ¶ 8 & Ex. B.  Girouard replied that

he was aware of one of the 510(k) submissions based upon discussions at KCI's regular

"Competitive Intelligence" meetings.  Meents Decl. ¶¶ 4-6; Tumey Decl. ¶¶ 8-11.  Tumey

explained to Mr. Girouard that his new company had developed and was considering launching a

chronic wound healing system that utilized negative pressure and a polyurethane foam dressing.

Meents Decl. ¶ 7; Tumey Decl. ¶ 12.  When asked how he thought KCI might react to the

introduction of such a product, Girouard responded, "KCI will act aggressively. You know that."

Tumey Decl. ¶ 12 & Ex. C; Meents Decl. ¶ 7 & Ex. A.

### 2.    September 17, 2007 Call with KCI's Senior Vice President of Manufacturing, Michael Burke

KCI is run by an Executive Committee comprised of approximately ten officers.  Michael

Burke was a member of KCI's Executive Committee for over a decade until his retirement in the

Fall of 2007.  Declaration of Michael Burke ¶ 2 ("Burke Decl.").  Mr. Burke was also KCI's

Senior Vice President of Manufacturing at the time of his retirement.  *Id.*  Tumey called Burke—

his former supervisor at KCI—to determine, as with Girouard, whether the parties could develop

a business relationship regarding the Svedman™ system, and alternatively, to assess the

litigation risk associated with launching the Svedman™ system.  Tumey Decl. ¶ 15.  Tumey and

Vogel believed that as an Executive Committee member and Senior Vice President of the company, Burke would be able to provide a realistic assessment of KCI's mind-set regarding enforcement of its patents against competitive products, including negative pressure, foam-based devices. *Id.* ¶ 16; Vogel Decl. ¶ 4. Vogel also believed that given his level in the KCI organization, Burke would be in a position to introduce Innovative Therapies to the right person in the event KCI would be interested in discussing a business relationship with Innovative Therapies. Vogel Decl. ¶ 5. Therefore, Tumey asked for Burke's advice regarding the launch of the Svedman™ system. Tumey Decl. ¶ 18.

Tumey explained to Burke that he was working on the launch of a new negative pressure wound healing system utilizing polyurethane foam dressing, and asked Burke how he thought KCI would react to the release of such a product. *Id.* Burke replied, "KCI will aggressively go after [you]", "particularly if it is foam-based." *Id.* & Ex. D. When asked whether KCI and Innovative Therapies could peacefully coexist regarding the Svedman™ system, Burke replied that there was "no way to coexist" and that it would not happen. *Id.* ¶ 20 & Ex. D. Tumey also queried Burke about the odds of a KCI suit if Innovative Therapies launched the Svedman™ system, to which Mr. Burke replied that the odds were "very big" "100% no doubt about it," and that any product that "scratches the surface of [KCI's] patents" would be the subject of a lawsuit. *Id.* ¶ 19 & Ex. D. Burke concluded by warning Tumey to steer clear of a negative pressure wound therapy device that is foam-based: "steer clear of npwt [negative pressure wound therapy] + foam-based." *Id.* ¶ 21 & Ex. D.

### E.   This Declaratory Judgment Action and KCI's Later-filed Actions in Texas and North Carolina

Anticipating certain litigation by KCI, Innovative Therapies filed this declaratory judgment action against KCI on September 25, 2007, seeking declarations that the five U.S. patents either assigned to or exclusively licensed to KCI are invalid and not infringed by Innovative Therapies' Svedman™ system. Am. Compl. ¶ 26. On October 15, 2007, KCI filed a motion to dismiss this declaratory judgment action, claiming that there was no case or

controversy between the parties.  *Id.* ¶ 28.  KCI specifically argued that it had never had an opportunity to inspect Innovative Therapies' new product.  *Id.*  While KCI's motion to dismiss was pending, ITI offered KCI the opportunity to inspect the Svedman™ system, and requested that KCI state within one week of the inspection whether it would provide Innovative Therapies a covenant not to sue.  *Id.* ¶ 29.  Representatives of KCI inspected the Svedman™ system at Innovative Therapies' counsel's office on December 4, 2007, and Innovative Therapies provided KCI with copies of the Instructions for Use and User Manual for the Svedman™ system.  *Id.* ¶ 30.  After the inspection, KCI refused to state whether it would grant a covenant not to sue, and continued to prosecute its motion to dismiss, filing its reply brief on December 12, 2007.  *Id.* ¶ 31.  Even though KCI filed its reply brief over one week after inspecting the Svedman™ system, KCI made no mention in its brief of the product inspection, ITI's request for a covenant not to sue, and KCI's refusal to grant a covenant not to sue.  *Id.* ¶ 32.

Rather than pursue counterclaims against Innovative Therapies in this Court, KCI filed two separate but related actions against Innovative Therapies in two different and, for Innovative Therapies, less convenient jurisdictions.  On January 2, 2008, KCI filed an action in Texas state court against Innovative Therapies and three of its officers concerning the ownership of the technology embodied in the Svedman™ system, the product at issue in this action.  *See Kinetic Concepts, Inc., et al. v. Innovative Therapies, Inc., et al.*, No. 2008-CI-00026 (Tex. Dist. Ct., Bexar Cty. filed Jan. 2, 2008) (the "Texas action").  *Id.* ¶¶ 36, 38.  KCI also claimed in the Texas action that the three Innovative Therapies officers misappropriated still unidentified trade secrets and confidential information of KCI, and used such unidentified information in the development of the Svedman™ system.  *Id.* ¶¶ 37-42.  Innovative Therapies has filed a motion to dismiss the Texas action against Innovative Therapies for lack of personal jurisdiction, and Innovative Therapies and the individual defendants have also filed a motion to stay pending the outcome of this declaratory judgment action.  Graves Decl. ¶¶ 22,33.  Both motions are currently pending before the Texas court.  *Id.*

One week after filing its Texas action, KCI, three foreign entities apparently related to

KCI, and Wake Forest Univ. Health Sciences ("Wake Forest") filed a patent infringement action against Innovative Therapies in the Middle District of North Carolina, alleging infringement of three of the five patents at issue in this case. *See Wake Forest University Health Sciences v. Innovative Therapies, Inc.*, No. 1:08-cv-32 (M.D.N.C. filed Jan. 10, 2008) (the "North Carolina action"). Am. Compl. ¶ 50. In that action, KCI claims that the Svedman™ system infringes three patents—all of which are at issue in this declaratory judgment action. *Id.* ¶ 51. On March 12, 2008, Innovative Therapies filed a motion to transfer the later-filed North Carolina action to this Court for consolidation with this first-filed action. Graves Decl. ¶ 24.

On January 25, 2008, Innovative Therapies filed an amended complaint in this action. Am. Compl. The Amended Complaint added factual allegations regarding: (1) the lawsuits filed by KCI against Innovative Therapies and its principals in other jurisdictions; (2) KCI's inspection of the Svedman™ system in December 2007 and subsequent refusal to provide Innovative Therapies a covenant not to sue; (3) the testing of the Svedman™ system prior to the filing of this action; and (4) the sales of the Svedman™ system since the filing of this action.

In addition, Innovative Therapies also added two new causes of action. First, Innovative Therapies added a claim seeking a declaration that it is the rightful and proper owner of the Svedman™ system and its related intellectual property in response to KCI's claims in the Texas action that KCI be declared the owner of the Svedman™ system. *Id.* ¶¶ 104-106. Second, Innovative Therapies added an unfair competition claim under the Lanham Act. That claim arises from false and misleading statements by KCI representatives to Innovative Therapies' customers about the Svedman™ system, including statements that the Svedman™ system does not work and is not FDA-approved. *Id.* ¶¶ 34-35.

After Innovative Therapies filed the Amended Complaint, KCI withdrew its motion to dismiss because the Amended Complaint "render[ed] the [m]otion moot." Withdrawal of Defs.' Mot. to Dismiss Complaint at 1 (D.I. 37). KCI subsequently sought and obtained a thirty day extension to determine how to respond to the Amended Complaint, and eventually filed this Motion to Dismiss (and in the alternative to transfer), regurgitating many of the same arguments

from its admittedly mooted motion.  KCI's Motion should be denied in its entirety for the reasons provided below.

## III.   ARGUMENT

"An amended complaint supersedes the original version in providing the blueprint for the future course of a lawsuit." *Snyder v. Pascack Valley Hosp.*, 303 F.3d 271, 276 (3rd Cir. 2002). "Once an amended pleading is interposed, the original pleading no longer performs any function in the case and any subsequent motion made by an opposing party should be directed at the amended pleading." 6 C. Wright, A. Miller & M. Kane, FEDERAL PRACTICE & PROCEDURE § 1476, at 556-57 (2d ed. 1990); *Davis v. TXO Prod. Corp.*, 929 F.2d 1515, 1517 (10th Cir. 1991) (citing Wright, Miller, & Kane); *Jordan v. City of Philadelphia*, 66 F. Supp. 2d 638, 641 n.1 (E.D. Pa. 1999).  Significantly, subject matter jurisdiction is determined as of the date of the filing of the amended pleading.  *Carney v. Resolution Trust Corp.*, 19 F.3d 950, 954 (5th Cir. 1994) (evaluating subject matter jurisdiction at the time plaintiffs filed a second amended complaint).  In addition, courts have held that amended complaints alleging facts that occurred subsequent to the original complaint may cure defects in subject matter jurisdiction.  *See, e.g., Proven Methods Seminars, LLC v. Am. Grants & Affordable Housing Inst., LLC*, 519 F. Supp. 2d 1057, 1063-64 (E.D. Cal. 2007) (amending complaint to add facts regarding the filing of plaintiff's copyright application and receipt of registration certificates that occurred after filing of copyright action); *Zito v. Steeplechase Films, Inc.*, 267 F. Supp. 2d 1022 (N.D. Cal. 2003) (same). *Bates v. Western Electric*, 420 F. Supp. 521, 525-27 (E.D. Pa. 1976) (amending complaint to allege facts that occurred after filing of original complaint).

These legal principles are dispositive of KCI's motion to dismiss.  Innovative Therapies filed an Amended Complaint that mooted KCI's original motion to dismiss, and KCI now seeks dismissal of the Amended Complaint.  Therefore, the inquiry facing the Court is whether subject matter jurisdiction existed at the time of the filing of the Amended Complaint.  There can be no reasonable dispute about the answer to that question.  Indeed, KCI does not even argue in its moving papers that the Amended Complaint fails to establish a sufficient case or controversy,

nor can it.  In addition to KCI's litigation history, public statements, and specific statements made to Messrs. Tumey and Meents as first detailed in the original Complaint, the Amended Complaint alleges KCI's subsequent inspection of the Svedman™ system and refusal to provide a covenant not to sue, KCI's false statements regarding the Svedman™ system, and the two related suits that KCI filed against Innovative Therapies in January 2008.  Thus, the allegations in the Amended Complaint plainly establish that a very substantial, real and immediate controversy exists between the parties regarding Innovative Therapies' declaratory judgment claims of invalidity and noninfringement.

Moreover, KCI does not contest the existence of subject matter jurisdiction based on the two new causes of action pled in the Amended Complaint.  Rather, KCI asserts that "ITI's attempts to add new causes of action in its First Amended Complaint cannot retroactively vest this Court with jurisdiction *relating back to the date of the original complaint*."  Mot. at 15 (emphasis added) (citations omitted).  That is a tacit admission that the allegations of the Amended Complaint do in fact establish subject matter jurisdiction.  KCI's assertion goes to whether the new causes of action relate back to the date of the original Complaint under Rule 15(c) of the Federal Rules of Civil Procedure, which is a question for another day; it has no bearing on the viability of the Amended Complaint.

Unable to challenge the existence of subject matter jurisdiction based on the Amended Complaint, KCI focuses on the allegations of the original Complaint.  Even if it were proper to ignore the Amended Complaint for purposes of deciding KCI's motion to dismiss the Amended Complaint, which it plainly is not, KCI's tactic is unavailing.  Indeed, as established below, a justiciable controversy existed between the parties at the time of the original Complaint.

**A.      The Legal Standard for Declaratory Judgment Subject Matter Jurisdiction.**

The Supreme Court recently clarified the relationship between Article III's jurisdictional requirements and the Declaratory Judgment Act in *MedImmune, Inc.*, 127 S. Ct. 764.  In *MedImmune*, the Court rejected the Federal Circuit's "reasonable apprehension of suit" standard because it conflicted with the Court's declaratory judgment subject matter jurisdiction precedent.

*Id.* at 774 n.11 (citing conflicts with *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273 (1941) and *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 239 (1937)).  Significantly, the Court found that the "reasonable apprehension of suit" standard was overly restrictive and thus inconsistent with the standards for Article III jurisdiction and the historical purpose of the Declaratory Judgment Act—to provide a challenger with an alternative to the Hobson's choice between "abandoning his rights or risking prosecution."  *Id.* at 773-75; *see also id.* at 772 (Article III "d[oes] not require … that the plaintiff bet the farm, so to speak, by taking the violative action.").

The Supreme Court explained that to establish subject matter jurisdiction, the declaratory judgment plaintiff must only satisfy the case-or-controversy requirement of Article III—standing and ripeness.  The doctrines of standing and ripeness are pragmatic and look to the totality of circumstances surrounding a particular dispute:

> [T]he question in each case is whether the facts alleged, under ***all the circumstances***, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

*Id.* at 771 (citing *Maryland Casualty*, 312 U.S. at 273) (emphasis added).  The declaratory judgment plaintiff must therefore allege the requisite facts to demonstrate "'under all the circumstances' [that] an actual or imminent injury caused by the defendant … can be redressed by judicial relief and … is of 'sufficient immediacy and reality to warrant the issuance of a declaratory judgment'."  *Teva Pharms. USA, Inc. v. Novartis Pharms. Corp.*, 482 F.3d 1330, 1338 (Fed. Cir. 2007) (quoting *MedImmune*, 127 S. Ct. at 771).  Significantly, the Supreme Court's rejection of the Federal Circuit's "reasonable apprehension of suit" test and realignment of declaratory subject matter jurisdiction with Article III in *MedImmune* has "'lower[ed] the bar for a plaintiff to bring a declaratory judgment action in a patent dispute.'"  *Monolithic Power Sys. v. O2 Micro Int'l Ltd.*, No. 07-2363, 2007 WL 2318924, at *3 (N.D. Cal. Aug. 13, 2007).

**B.**     **"All the Circumstances" Demonstrate An "Actual Controversy" Between the Parties.**

KCI fails to analyze the facts at issue under *MedImmune*'s "all circumstances" standard.

Indeed, KCI improperly isolates and ***individually*** assesses the facts supporting jurisdiction rather

than analyzing "all the circumstances" as required under *MedImmune*.  When considered

together, "all the circumstances" show that a case or controversy existed at the time Innovative

Therapies originally filed this declaratory judgment action because it was under the threat of an

imminent patent infringement lawsuit by KCI.[5]  *See Teva*, 482 F.3d at 1338.

First, Innovative Therapies had completed every task necessary to commence sales of the

Svedman™ system prior to filing suit, having:
- applied for and received FDA approval;
- successfully completed clinical evaluations involving the treatment of five patients;
- entered into non-disclosure agreements with prospective purchasers and investors, and pre-marketed the device to prospective purchasers.

Second, two key KCI decision-makers, including a member of KCI's Executive Committee, had

confirmed that KCI was not interested in a business relationship with Innovative Therapies and

one of those decision-makers confirmed that KCI would sue any company that offered a foam-

based, negative pressure device like the Svedman™ system.  Tumey Decl. ¶¶ 12-13, 18-20.

Third, KCI was aware of at least one of Innovative Therapies' 510(k) submissions seeking FDA

approval to sell a negative pressure wound treatment system, and KCI had previously sued every

viable competitor in the chronic wound care market that had offered such a system.  Innovative

Therapies therefore filed suit against KCI, seeking a declaration of its legal rights in order to

protect its significant investment of time and money in the Svedman™ system and to relieve "the

Damoclean threat of impending litigation."  Wright & Miller, 10B FEDERAL PRACTICE &

PROCEDURE § 2751 (quotation omitted).

**1.**     **Key KCI Decision-Makers Made Clear That KCI Would Sue Innovative Therapies.**

KCI effectively rebuffed Innovative Therapies' attempts to explore the possibility of a

---

[5] A lawsuit, consistent with Innovative Therapies averments at the time of the filing of its original Complaint in this action, was indeed filed by KCI on January 10, 2008.

business relationship between the two companies and made clear that KCI would sue Innovative Therapies if it offered the Svedman™ system.  Tumey Decl.¶¶ 12-13, 18-20.  Thus, Vogel and Tumey's expectation of litigation was independently confirmed by two KCI employees.  Prior to initiation of this action, Innovative Therapies learned that KCI was aware of Innovative Therapies' efforts to develop a negative pressure wound therapy device.  KCI's Director of Marketing, Girouard, admitted to Tumey that one of Innovative Therapies' 510(k) statements seeking approval for a negative pressure wound therapy system had been discussed at KCI's regular "Competitive Intelligence" meeting.  Tumey Decl. ¶¶ 8-11 & Ex. D; Meents Decl. ¶¶ 4-6 & Ex. A.  Significantly, when asked how KCI would react to Innovative Therapies' introduction of a wound therapy system that utilized negative pressure and a polyurethane foam dressing, Girouard explained that KCI would analyze the system product and sue if it thought that the system infringed:  "KCI will act aggressively.  You know that."  Tumey Decl. ¶ 12 & Ex. C; Meents Decl. ¶ 7 & Ex. A.

In a subsequent telephone call, KCI's Senior Vice President of Manufacturing and Executive Committee member, Burke, also made clear that KCI had no interest in a business relationship with Tumey's new company.  Tumey Decl. ¶ 20 & Ex. D ("No way to coexist").  Burke further asserted that the foam-based, negative pressure system described by Tumey would be covered by KCI's patents.  Indeed, Burke explained that KCI would "aggressively" pursue litigation against such a system, "particularly if it is foam-based," and that the odds KCI would sue Innovative Technologies were "100%" because "[a]nything that scratches the surface of our patents, we will go after them."  *Id.* ¶¶ 19-20 & Ex. D.  Burke urged his former subordinate Tumey to "steer clear" of foam-based products utilizing negative pressure.  *Id.* ¶ 21 & Ex. D.

KCI's attempts to downplay the substance of statements made by both Messrs. Burke and Girourard that are consistent with long-established KCI corporate philosophy and practices, and to trivialize these statements as "reflexive" or otherwise involuntary, Mot. at 9-10, are unavailing.  First, neither of these experienced business executives declined to talk Mr. Tumey, nor did they decline to provide their views on competing products.  Second, it is no coincidence

14

that both business executives articulated almost the exact same position regarding KCI's expected reaction to the launch of a wound therapy system utilizing negative pressure and a polyurethane foam dressing.  Indeed, KCI had already discussed Innovative Therapies and at least one of its 510(k) submissions during a KCI "Competitive Intelligence" meeting.  Third, Messrs. Girouard's and Burke's statements only confirmed what Vogel and Tumey already believed based upon their own experiences at KCI:  KCI would aggressively litigate to eliminate the Svedman™ system as a competitive threat.  "To view the facts of this case any differently would be to totally ignore the realities of business life."  *See Sherwood Med. Indus., Inc. v. Deknatel, Inc.*, 512 F.2d 724, 729 (8th Cir. 1975) (finding subject matter jurisdiction for a declaration judgment action after considering the "entire course of action and all of the defendant's relevant conduct").

Whether Messrs. Girouard or Burke had the authority to make binding litigation decisions is of no import to the determination of the existence of a case or controversy.  *See Sherwood*, 512 F.2d at 729 (considering statements of employees that could not bind the defendant corporation in finding an actual controversy).  Significantly, KCI does not cite any post-*MedImmune* authority for its proposition that only binding threats of suit made by specific corporate representatives are sufficient to create a case or controversy.  KCI's apparent position of predicating the existence of a case or controversy on the statements of only a Chief Executive Officer (CEO) or General Counsel, *see* Mot. at 8-10, would contravene the broad consideration of "all the circumstances" required under *MedImmune*.  Indeed, as a former Executive Committee member himself, Mr. Vogel knew from his personal KCI experience that an Executive Committee member, such as Mr. Burke, would be aware of the corporate policy regarding enforcement of the company's patent rights.  Vogel Decl. ¶ 3; *see also* Tumey Decl. ¶ 16.  Furthermore, KCI has publicly articulated its corporate policy to aggressively enforce its patents in its 10-K filings.  Ex. 4 to Declaration of Don O. Burley at 22 ("If we are unsuccessful in protecting and maintaining our intellectual property, particularly our rights under the Wake

Forest patents, our competitive position would be harmed.").[6]

In any event, Congress enacted the Declaratory Judgment Act to, *inter alia*, "permit[] actual controversies to be settled before they ripen into violations of law or a breach of contractual duty."  Wright & Miller, 10B FEDERAL PRACTICE & PROCEDURE § 2751 (quotation omitted).  Requiring a potential declaratory judgment plaintiff to seek the infringement opinion of the CEO or General Counsel of a patent owner before filing suit would frustrate that intent, because the contemplated defendant would inevitably file a pre-emptive suit.  The Supreme Court made clear in *MedImmune* that a declaratory judgment plaintiff need not "***bet the farm***, or (as here) risk treble damages … before seeking a declaration of its actively contested legal rights."  127 S. Ct. at 775 (emphasis added).  Accordingly, there was no need for Innovative Therapies to provoke a lawsuit by KCI before filing its declaratory judgment complaint.

Contrary to KCI's unsubstantiated assertions, Mot. at 3-5, Mr. Tumey did not contact his former supervisor and colleague at KCI to manufacture a dispute.  Tumey Decl. ¶¶ 6, 15.  Nor did Mr. Tumey cloak his intentions under the guise of friendship.  Mr. Tumey clearly explained to both Girouard and Burke that he was calling to determine KCI's position regarding the imminent launch of a competing product—the Svedman™ system.  *Id.* ¶¶ 12, 18.  Neither Girouard nor Burke asserts that Tumey somehow tricked them into talking.  Either experienced business executive could have simply refused to speak to Mr. Tumey regarding the potential competing product, but instead they both opined at length, articulating essentially the same KCI position on the introduction of a foam-based, negative pressure wound therapy system.  To be sure, Messrs. Burke and Girouard are neither naïve, nor litigation neophytes; they are successful business professionals who serve as critical decision-makers in a business that embraces litigation to protect its market share.

In addition, Messrs. Burke's and Girouard's declarations include admittedly "equivocal" statements, Mot. at 8, that seek to downplay the statements they obligingly made to Mr. Tumey.

---

[6] KCI commonly refers to the patents-in-suit (except for the '880 patent) as the Wake Forest patents because it licenses those patents from Wake Forest University.

Mr. Girouard asserts that he "was not aware of Mr. Tumey's two 510(k)s … before [the] conversation."  Declaration of Michael Girouard ¶ 11 ("Girouard Decl.").  Yet, Mr. Meents's contemporaneous notes show that Mr. Girouard in fact stated that he was aware of at least one of Innovative Therapies' two 510(k) submissions filed with the FDA.[7]  Meents Decl. ¶¶ 4-6 & Ex. A.  Furthermore, Mr. Tumey also recalls Mr. Girouard expressing his awareness of one of Innovative Therapies' 510(k) submissions based upon his attendance at a KCI "Competitive Intelligence" meeting.  Tumey Decl. ¶¶ 8-11 & Ex. B.  And, significantly, Mr. Girouard's lack of certainty regarding his own self-serving recollection undermines his credibility:  "I think I told Mr. Tumey that [the decision to sue] would not be my determination."  Girouard Decl. ¶ 10.  *Contra* Tumey Decl. ¶ 14.

Statements in Mr. Burke's declaration are similarly dubious.  Mr. Tumey's contemporaneous notes do not include Mr. Burke's post-hoc recollection that he told Mr. Tumey "he was out of the loop and could not speak for KCI on legal matters", and Mr. Tumey is confident that Mr. Burke did not provide such a disclaimer.  Tumey Decl. ¶ 22 & Ex. D.  Indeed, Burke spoke at length with Tumey about the ramifications of introducing a new negative pressure wound healing system utilizing a polyurethane foam dressing to the market, and Mr. Burke does not deny that he warned Tumey to "steer clear" of foam-based products utilizing negative pressure.  *Id.* ¶ 21 & Ex. D.

> **2.     The Federal Circuit's Recent Decision in *Micron v. Mosaid* Confirms that a Case and Controversy Existed When Innovative Therapies Filed Its Original Complaint.**

The Federal Circuit's most recent application of *Medimmune* confirms that subject matter jurisdiction existed at the time Innovative Therapies filed its original Complaint.  *See Micron Tech., Inc. v. Mosaid Techs., Inc.*, -- F.3d --, 2008 WL 540182 (Fed. Cir. Feb. 29, 2008) (attached as Exhibit C to the Graves Declaration).  In *Micron*, the Federal Circuit applied

---

[7] Mr. Girouard stated that he had learned of one of Innovative Therapies' 510(k) statements during a KCI "Competitive Intelligence" meeting.  Thus, discovery of meeting agendas, materials, and notes should reveal whether Mr. Girouard's present recollection on this issue are accurate.

*MedImmune*'s "all the circumstances" rule in reversing the district court's dismissal of a

declaratory judgment action for lack of subject matter jurisdiction.  The Federal Circuit found

that the district court erred by considering only one factor—whether an "explicit threat or other

action by the patentee … create[d] a reasonable apprehension of suit"—instead of all the

circumstances as required under *MedImmune*.  *Id.* at *3.  The Federal Circuit evaluated each of

the circumstances surrounding Micron's filing of its declaratory judgment action and concluded

that a sufficient controversy existed at the time of filing, focusing particularly on the facts that

Mosaid had (a) "sue[d] each of the other leading DRAM manufacturers," and (b) made recent

public statements in an annual report "confirm[ing] its intent to continue an aggressive litigation

strategy."  *Id.*  The Federal Circuit further explained that the *MedImmune* decision has relaxed

the standard for establishing declaratory judgment jurisdiction:

> Whether intended or not, the now more lenient legal standard
> facilitates or enhances the availability of declaratory judgment
> jurisdiction in patent cases.

*Id.* at *4.

Here, KCI would have the Court follow the same erroneous analysis rejected by the

Federal Circuit in *Micron*.  Indeed, KCI argues that there was no case or controversy at the time

Innovative Therapies filed its original Complaint because KCI had not specifically

communicated that it believed Innovative Therapies' Svedman™ system infringed KCI's

patents.  Mot. at 10-11.  Moreover, KCI incorrectly contends that public statements and litigation

history have no bearing on the jurisdictional analysis.  *Id.* at 12-14.

But the Federal Circuit rejected any particular focus on one factor in favor of "all the

circumstances."  *Micron*, 2008 WL 540182 at *3.  Similar to the facts relied upon by the Federal

Circuit in *Micron*, KCI has both publicly expressed and demonstrated its intent to enforce

aggressively its patent portfolio against all competitors and even end-user customers.  KCI does

not dispute that it has sued ten defendants in six different lawsuits during the past six years.  Mot.

at 12.  Although KCI attempts to downplay its litigation track record as "just a handful of

disputes," in reality, the "two groups of related companies" it admits to having sued account for

*all* of its successful competitors in the chronic wound therapy field. *Id.* Significantly, no company has successfully launched a commercially viable negative pressure wound care system without being sued by KCI for patent infringement. Further, other post-*MedImmune* courts have also considered the litigation history of a declaratory judgment defendant as a factor in determining the existence of a case or controversy. *See, e.g.*, *SanDisk Corp. v. STMicroelectronics, Inc.*, 480 F.3d 1372, 1383 (Fed. Cir. 2007) (patentee's "preparedness and willingness to enforce its patent rights" supported declaratory judgment jurisdiction); *Crutchfield New Media, LLC v. Charles E. Hill & Assocs., Inc.*, No. 1:06-CV-0827, 2007 WL 1320750, at *2 (S.D. Ind. May 4, 2007) (patentee's pattern of filing suit, or "enforcement tactics," was a factor in finding a substantial controversy between the parties to warrant declaratory relief).

Innovative Therapies' customers, including doctors and health care facilities, also face the threat of litigation. KCI has previously filed suit against a hospital system for patent infringement based upon the use of negative pressure wound treatment devices by non-profit institutions Charity Hospital and University Medical Center in New Orleans, Louisiana. Ex. B to Graves Decl. at 2. KCI also sued a doctor who "developed a makeshift device to apply localized sub-atmospheric pressure to the wounds of his patients" when the hospital ordered the staff to stop using KCI's V.A.C.® system. Ex. A to Graves Decl. at 4. Further, nearly every potential Svedman™ system customer approached by Innovative Therapies has expressed its concern regarding the very real threat of suit by KCI, Vogel Decl. ¶ 23, evidencing the widespread industry knowledge of KCI's litigation tactics.

## C.   The Court Should Decline to Exercise Its Discretion to Dismiss this Action Because of the Public Interests Involved in the Treatment of Chronic, Non-healing Wounds.

When there is an actual controversy and a declaratory judgment would settle the dispute, the declaratory judgment is typically not subject to dismissal. *See, e.g.*, *Genentech v. Eli Lilly & Co.*, 998 F.2d 931, 937 (Fed. Cir. 1993). Indeed, contrary to KCI's assertion, Mot. at 17, this suit is consistent with the purpose of the Declaratory Judgment Act: "courts must be mindful that the purpose of the Act is to allow alleged infringers relief from uncertainty and delay."

*Echostar Satellite LLC v. Finisar Corp.*, 515 F. Supp. 2d 447, 452 (D. Del. 2007) (concluding that exercising jurisdiction was appropriate).  KCI has accused the Svedman™ system of infringement, and has further alleged that KCI is the rightful owner of Innovative Therapies' product and its associated intellectual property, albeit in courts of its own choosing.  There is unquestionably an actual controversy between the parties that affects not only the viability of Innovative Therapies' business, but also the public interest in providing medical care to patients suffering with chronic, non-healing wounds.  Accordingly, Innovative Therapies is entitled to an adjudication by this Court of the issues of nonfringement and invalidity raised in its first-filed Declaratory Judgment action.  *See Eccles v. Peoples Bank*, 333 U.S. 426, 431 (1948) (As a general rule, discretion in a declaratory judgment action is to be "exercised in the public interest.").

KCI's attempt to avoid litigating the parties' disputes in this Court by making unsubstantiated allegations of gamesmanship is unavailing.  Those allegations are entirely baseless.  Moreover, Innovative Therapies has gained no unfair tactical advantage by suing in Delaware, where both KCI USA, Inc. and KCI Licensing, Inc. are incorporated.  Indeed, this District has a significant interest in litigation involving Delaware corporate entities:

> [Declaratory judgment defendant's] complaints about litigating here are outweighed by the fact that [Declaratory judgment defendant] has enjoyed the benefits and protections of Delaware as a limited partnership here and the State has an interest in litigation regarding companies incorporated within its jurisdiction.

*Oracle Corp. v. epicRealm Licensing, L.P.*, No. 06-414-SLR, 2007WL 901543, at *8 (D. Del. Mar. 26, 2007).  The Court should accordingly reject KCI's request that the Court exercise its discretion under the Declaratory Judgment Act to dismiss this action.

### D.     The Court Should Deny KCI's Request to Transfer this Action to the Middle District of North Carolina.

#### 1.     The Legal Standard for Transfer of Venue

Section 1404(a) permits a court to transfer a case for the convenience of the parties and witnesses and in the interest of justice to another district in which the action might have been brought.  28 U.S.C. § 1404(a).  The movant bears the burden "to establish that the balance of

convenience of the parties and witnesses ***strongly*** favors" the movant.  *Boston Scientific Corp. v. Johnson & Johnson Inc.*, 532 F. Supp. 2d 648, 654 (D. Del. 2008) (emphasis added; quotation omitted) (Robinson, J.).  "Unless the balance is strongly in favor of a transfer, the plaintiff's choice of forum should prevail."  *ADE Corp. v. KLA-Tencor Corp.*, 138 F. Supp. 2d 565, 567-68 (D. Del. 2001).  The general rule favors the forum of the first-filed action.  *Genentech*, 998 F.2d at 937.  And, "[t]he considerations affecting transfer to or dismissal in favor of another forum do not change simply because the first-filed action is a declaratory action."  *Micron*, 2008 WL 540182 at *6 (quoting *Genentech*, 998 F.2d at 938).

The district court must weigh in the balance a number of case specific factors.  The Third Circuit identified the potential factors for consideration in a convenience transfer analysis, which it characterized as private[8] or public interests,[9] in *Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 879 (3d Cir. 1995).  Significantly, "Section 1404(a) provides for transfer to a more convenient forum, not to a forum likely to prove equally convenient or inconvenient."  *Van Dusen v. Barrack*, 376 U.S. 612, 645-46 (1964).  Moreover, where transfer would merely shift the inconvenience from one party to another, the original choice of forum prevails.  *See Walter Kidde Portable Equip., Inc. v. Univ. Sec. Instr., Inc.*, 304 F. Supp. 2d 769, 773 (M.D.N.C. 2004).

**2.      The First-Filed Rule Favors Maintaining this Action in this Court.**

Two vital facts simply cannot be disputed:  (a) Innovative Therapies filed this action first; and (b) KCI's claims in the North Carolina action are the mirror image of the claims here,

---

[8] The private interests include:  (1) plaintiff's forum preference as manifested in the original choice; (2) the defendant's preference; (3) whether the claim arose elsewhere; (4) the convenience of the parties as indicated by their relative physical and financial condition; (5) the convenience of the witnesses but only to the extent that the witnesses may actually be unavailable for trial in one of the fora; and (6) location of books and records (similarly limited to the extent that the files could not be produced in the alternative forum).  *Jumara*, 55. F.3d at 879-80.

[9] The public interests include:  (1) the enforceability of the judgment; (2) practical considerations that could make the trial easy, expeditious or inexpensive; (3) the relative administrative difficulty in the two fora resulting from court congestion; (4) the local interest in deciding controversies at home; (5) the public policies of the fora; and (6) the familiarity of the trial judge with the applicable state law in diversity cases.  *Jumara*, 55. F. 3d at 879-80..

involving the same accused product and three of the very same patents at issue.  As a result, the first-to-file rule strongly supports the denial of KCI's motion to transfer.

At the outset, courts should afford plaintiff's choice of forum deference so long as the plaintiff selected the forum for some legitimate reason.  *C.R. Bard, Inc. v. Guidant Corp.*, 997 F. Supp. 556, 562 (D. Del. 1998).  Innovative Therapies appropriately chose to file this action in Delaware because it, like two of the KCI Defendants, is a Delaware corporation.  *See Boston Scientific*, 532 F. Supp. 2d at 565 ("a corporation's decision to incorporate in a particular state is a rational and legitimate reason to litigate in that state").  Therefore, KCI must prove that "the balance of convenience and the interests of justice weigh strongly in favor of transfer" to the North Carolina court.  *In re M.L.-Lee Acquisition Fund II, L.P.*, 816 F. Supp. 973, 976 (D. Del. 1993).  KCI cannot make such a showing.

The parties and the claims at issue have virtually no nexus to North Carolina.  In particular, the only two aspects of this case that are allegedly linked to North Carolina are the fact that the Svedman™ system was used at a single facility in North Carolina and the vague assertion that "technological advancements recognized in [three of the patents-in-suit] were each made by researchers working … in North Carolina."  Mot. at 19.[10]  As reflected by KCI's previous patent enforcement actions, however, including cases asserting one or more of the patents-in-suit, KCI regularly selects jurisdictions outside of North Carolina, and has never, to Innovative Therapies' knowledge, previously filed a patent suit in the Middle District of North Carolina.  Specifically, KCI has filed its patent infringement suits in Louisiana, Michigan, and Texas.  Am. Compl. ¶ 23.  Therefore, the only connection KCI has with the North Carolina court

---

[10] KCI also asserts that the North Carolina court is more convenient "because the persons with relevant knowledge of the development of" three of the patents-in-suit are located in that district. Mot. at 19.  However, KCI "has identified no witness who is reluctant to testify and who is beyond the subpoena power of the court."  *Boston Scientific*, 532 F. Supp. 2d at 565 (rejecting motion to transfer); *see also Oracle Corp.*, 2007 WL 901543 at *4 ("Considering that discovery can be conducted at any location convenient to the parties and their employees, the only event that will take place in Delaware is the trial.  The travel expenses and inconveniences incurred for that purpose, by a Delaware defendant, is not overly burdensome.").

is its attempted avoidance of litigating the validity and alleged infringement of the patents-in-suit in this Court.

Innovative Therapies is principally located in Maryland.  Vogel Decl. ¶ 25.  Innovative Therapies does not maintain a place of business in North Carolina, nor does it own any real or tangible property or employ any employees in North Carolina.  *See id.* ¶¶ 24-29.  Innovative Therapies, therefore, has virtually no connection to the Middle District of North Carolina, other than the presence of one customer, and that customer currently does not have a Svedman™ system.  *Id.* at ¶ 30.  In short, this declaratory judgment action should not be transferred to the North Carolina court because the action has no meaningful connection to that District.

### 3.   The Remaining Applicable Factors Support A Transfer To Innovative Therapies' First-Filed Action In Delaware.

The remaining applicable factors also weigh in favor of denying KCI's motion to transfer Innovative Therapies' first-filed action to North Carolina.

### a.   Enforceability of a judgment.   Two KCI entities and Innovative

Therapies are Delaware corporations.  Any judgment, therefore, in the Delaware action can easily be enforced.  None of the parties have any connection to the North Carolina court.

### b.   Practical considerations that make a trial easy, expeditious, or

**inexpensive.**  As with most patent cases, the relevant proof will consist of documents, expert witness testimony, and other witness testimony.  KCI is principally located in Texas.  Thus, all of the KCI representatives must travel by air in order to attend any court proceeding in North Carolina or Delaware.  On the other hand, Innovative Therapies is located in Maryland – less than 2 hours by car or train to this courthouse.  If this case were transferred to North Carolina, Innovative Therapies would be forced to travel by air to the North Carolina court, thereby imposing inconvenience on Innovative Therapies without remedying any purported inconvenience to KCI.  Accordingly, the convenience of the witnesses favors keeping this action in Delaware.  *See Walter Kidde*, 304 F. Supp. 2d at 773 (merely shifting the inconvenience from one party to another does not outweigh the preference given to the first-filed action).

It appears that KCI has no interest in conserving judicial resources or making any trial concerning its patents and Innovative Therapies' Svedman™ system easy, expeditious, or inexpensive, given KCI's filing of the North Carolina and Texas actions several months after this case was filed.  KCI appears intent on wasting the resources of the parties and the Courts in an effort to put its fledgling competitor, Innovative Therapies, out of business.  Moreover, KCI's claims for infringement easily can be asserted as counterclaims in this first-filed action, and this District is well-versed in the nuances of patent litigation.  In order to conserve the time and resources of all parties, this case should remain in this District.

         **c.**      **Administrative difficulties of court congestion.**  According to the U.S. Courts website, both this Court and the North Carolina court carry heavy dockets.  Specifically, for the period of April 1, 2006 to March 31, 2007, there were 1,073 new case filings, 1,106 cases terminated, and 978 cases still pending in the North Carolina court.  Federal Court Management Statistics, U.S. District Courts, http://www.uscourts.gov/caseload2007/tables/C00Mar07.pdf (last visited on Mar. 7, 2008).  With respect to the same time period for this Court, there were 862 new case filings, 932 cases terminated, and 1,340 cases pending.  *Id.*  As for the time from the filing of the complaint to trial, both courts move at about the same speed.  *See* Federal Court Management Statistics at http://www.uscourts.gov/cgi-bin/cmsd2007.pl (last visited Apr. 2, 2008) (2005 statistics for time from plaint to trial:  North Carolina court—18 months; Delaware—23.5 months).  The slightly greater average speed of the North Carolina court is offset by the fact that this action is more advanced.  Innovative Therapies filed this action more than three months before KCI filed the North Carolina action.  And, in spite of KCI's stall tactics, the parties have already exchanged initial disclosures and Innovative Therapies has served requests for production and interrogatories on KCI.

       **E.**      **Innovative Therapies' Declaration of Ownership Is Properly Before This Court.**

Contrary to KCI's arguments, Mot. at 22-24, Innovative Therapies' declaration of ownership is properly before this Court.  Indeed, if KCI in fact owns the Svedman™ system

technology—as it claims in the Texas action—then Innovative Therapies would have no standing

to pursue this declaratory judgment action.  In other words, Innovative Therapies would have no

basis to seek a declaratory judgment that the Svedman™ system does not infringe KCI's patents

and/or that KCI's patents are invalid if it does not own the Svedman™ system.  In addition, the

determination of ownership may involve questions of inventorship that are governed by federal

patent law.  Moreover, the operative KCI agreement setting forth confidentiality and non-

competition obligations of Tumey—the former KCI employee and current Innovative Therapies'

officer accused of misappropriating KCI trade secrets and violating a non-competition

agreement—is governed by Delaware law.  Am. Compl. at ¶¶ 44, 45, 49 & Ex. G.  Therefore,

any dispute regarding Tumey's post-termination obligations under that agreement or the

ownership of the Svedman™ system and related intellectual property would be best resolved in

this forum.  *Rimmax Wheels LLC v. RC Components, Inc.*, No. 06-029-SLR, 2007 WL 121772,

*3 (D. Del. Jan. 10, 2007) ("Clearly, Delaware has a substantial connection to this case:  plaintiff

is a Delaware limited liability company [and] by the Agreement, this dispute shall be governed

by Delaware law").

## IV.   CONCLUSION

For the reasons set forth above, Innovative Therapies respectfully requests that the Court

deny Defendants' Motion to Dismiss.

Dated: April 4, 2008

PARKOWSKI, GUERKE & SWAYZE, P.A.

*Of Counsel*:

Jonathan G. Graves
Erik B. Milch
Justin P.D. Wilcox
Scott Cole
COOLEY GODWARD KRONISH LLP
Reston Town Center
11951 Freedom Drive
Reston, Virginia 20190-5656
Telephone: (703) 456-8000

Thomas H. Kovach (DE Bar #3964)
Parkowski, Guerke & Swayze, P.A.
800 King Street, Suite 203
Wilmington, DE  19801
Telephone: (302) 654-3300

*Attorneys for Plaintiff Innovative Therapies, Inc.*

25

## <u>CERTIFICATE OF SERVICE</u>

   I hereby certify that on April 4, 2008, a copy of the foregoing Plaintiff's

Opposition to Defendants' Motion to Dismiss was served with the Clerk of the Court using

CM/ECF, which will send automatic notification of the filing to the following

     Steven J. Balick, Esq.
     John G. Day, Esq.
     Tiffany Geyer Lydon, Esq.
     Ashby & Geddes
     500 Delaware Avenue, 8th Floor
     P.O. Box 1150
     Wilmington, DE  19899


In addition, the forgoing was also served via e-mail upon:

     Donald R. Dunner, Esq.
     Don O. Burley, Esq.
     Finnegan, Henderson, Farabow, Garrett & Dunner, LLP
     901 New York Avenue, NW
     Washington, DC 20001-4413
     don.dunner@finnegan.com
     don.burley@finnegan.com

     Erik R. Puknys, Esq.
     Jason M. Webster, Esq.
     Finnegan, Henderson, Farabow, Garrett & Dunner, LLP
     3300 Hillview Avenue
     Palo Alto, CA 94304-1203
     Erik.puknys@finnegan.com
     jason.webster@finnegan.com

     R. Laurence Macon, Esq.
     Akin Gump Strauss Hauer & Feld, LLP
     300 Convent Street, Suite 1500
     San Antonio, TX 78205
     lmacon@akingump.com


     */s/ Thomas H. Kovach*
     Thomas H. Kovach (#3964)