## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| INNOVATIVE THERAPIES, INC., | : | |
| | : | |
| Plaintiff. | : | |
| | : | |
| v. | : | Civil Action No. 07-589-SLR-LPS |
| | : | |
| KINETIC CONCEPTS, INC., KCI | : | |
| LICENSING, INC. and KCI USA, INC. | : | |
| | : | |
| Defendants. | : | |

## REPORT AND RECOMMENDATION REGARDING
## DEFENDANTS' MOTION TO DISMISS

This patent case has been referred to me for a Report and Recommendation pursuant to

28 U.S.C. § 636(b). (D.I. 7)  Plaintiff seeks: (1) a declaration of noninfringement and invalidity

of Defendants' patents related to medical devices used in negative pressure wound therapy; (2) a

declaration that Defendants made false and misleading statements about Plaintiff's wound

treatment device in violation of the Lanham Act, 15 U.S.C. § 1125(a), along with money

damages and an injunction against further false statements; and (3) a declaration that Plaintiff is

the sole owner of its own wound treatment device and any related intellectual property.

Presently before me is Defendants' motion to dismiss Plaintiff's first amended complaint

due to a purported lack of subject matter jurisdiction.  (D.I. 44)  In the event that I find that this

Court possesses subject matter jurisdiction, Defendants move to transfer this action to the Middle

District of North Carolina, pursuant to 28 U.S.C. § 1404(a).  *Id.*  In the further alternative,

Defendants move to dismiss or stay Count XII of the amended complaint (which seeks a

declaratory judgment of ownership of intellectual property) on the ground that it mirrors a cause

of action Defendants already filed in Texas state court. *Id.* For the reasons stated below, I

recommend that Defendants' motion to dismiss be GRANTED.


## JURISDICTIONAL AND PROCEDURAL BACKGROUND[1]

The Parties

Plaintiff Innovative Therapies, Inc. ("Innovative") is a Delaware corporation with its

principal place of business in Hunt Valley, Maryland. (D.I. 36 ¶ 1) Innovative was co-founded

in 2006 by the professor and inventor Dr. Paul Svedman along with a former officer and several

former employees of Defendants. (D.I. 36 ¶ 15) Innovative develops and produces therapies in

the area of patient wound care. *Id.*

Defendant Kinetic Concepts, Inc. is a Texas corporation with a principal place of business

in San Antonio, Texas. (D.I. 36 ¶ 2) Its co-defendants, KCI Licensing, Inc. and KCI USA, are

its wholly-owned subsidiaries. (D.I. 36 ¶¶ 3-4) KCI Licensing and KCI USA are Delaware

corporations with principal places of business in San Antonio. *Id.* (Defendants are referred to

collectively hereinafter as "KCI.")

KCI is a medical products designer and manufacturer that has sold several negative

pressure wound therapy devices under the registered trademark V.A.C.® (D.I. 36 ¶ 9) KCI's

wound therapy devices are covered by a portfolio of patents, including the five patents in suit,

U.S. Patents No.: (1) 4,969,880 ("the '880 patent"), (2) 5,636,643 ("the '643 patent"),

---

[1]Except where describing certain declarations made part of the record by Defendants, this
Background takes as true the allegations contained in Innovative's amended complaint.

(3) 5,645,081 ("the '081 patent"), (4) 7,198,046 ("the '046 patent"), and (5) 7,216,651 ("the '651

patent"). *Id.* KCI is the assignee of the '880 patent. (D.I. 48 at 4) The remaining four patents in

suit are owned by Wake Forest University. (D.I. 36 ¶¶ 10-14) KCI holds the exclusive,

worldwide right to make, use, lease, and sell products incorporating the inventions covered by

the Wake Forest patents. *Id.*

Innovative Develops The Svedman Wound Treatment System

In 2007, Innovative finalized development of a negative pressure wound therapy device

named the Svedman™ Wound Treatment System ("Svedman"). (D.I. 36 ¶ 16) The Svedman is

purportedly based upon Dr. Paul Svedman's work in the field of wound therapy in the late 1970s

and early 1980s. (D.I. 48, Vogel Decl. ¶ 12) Innovative describes its system as offering wound

care equivalent to KCI's V.A.C.® at a significantly lower cost and in an easier-to-use form.

(D.I. 48 at 3)

Innovative made two 510(k) submissions to the Food and Drug Administration (FDA)

relating to the Svedman, using a streamlined procedure allowing an applicant to claim that its

new medical device "has essentially the same technological characteristics" as a "predicate

device" previously approved by the FDA. (D.I. 36 ¶ 17) On March 30, 2007, Innovative

submitted a 510(k) premarket notification to the FDA for a product it called the "ANTLIA II

Suction Pump System," which utilizes negative pressure to promote wound healing. (D.I. 36

¶ 18; D.I. 48 Ex. A) Innovative claimed the Bluesky Medical Versatile 1 Wound Vacuum

System and the Medela Invia Healing System as "predicate devices" to the ANTLIA II. *Id.* The

makers of these predicate devices, Bluesky and Medela, have each been sued by KCI for patent

infringement.[2]

On May 8, 2007, Innovative submitted a 510(k) premarket notification to the FDA for a product called the "ANTLIA I Wound Irrigation System," which promotes wound healing through a combination of negative pressure and irrigation. (D.I. 36 ¶ 19; D.I. 48 Ex. A) Innovative claimed KCI's V.A.C.® as a predicate device, asserting that the ANTLIA I had "essentially the same technological characteristics" as the V.A.C.® (D.I. 36 ¶ 19) The FDA approved both of Innovative's submissions. (D.I. 36 ¶¶ 18-19; D.I. 48 Ex. A)

Events Leading To Filing Of The Initial Complaint

Prior to the filing of Innovative's initial complaint on September 25, 2007, Innovative Chief Technology Officer (and former KCI Director of Research and Development) David Tumey contacted two of his former colleagues at KCI "to assess the potential for avoiding litigation by consummating a business relationship between the parties." (D.I. 48 at 6) It is undisputed that on September 12, 2007, Tumey spoke by telephone to KCI Director of Marketing Michael Girouard about the possibility of litigation between Innovative and KCI over the Svedman device. (D.I. 48, Meents Decl. & Tumey Decl.; D.I. 11, Girouard Decl.)[3] It is further undisputed that Mark Meents, another former KCI employee and Innovative co-founder, also participated in the call to Girouard. (D.I. 48, Meents Decl. & Tumey Decl.; D.I. 11, Girouard

---

[2]*See Kinetic Concepts, Inc, et al. v. Medela AG*, No. 07-187 (E.D. Tex.) (filed May 15, 2007) (pending) and *Kinetic Concepts, Inc., et al. v. Bluesky Med. Corp.*, No. 03-832, 2007 WL 1113002 (W.D. Tex. April 4, 2007).

[3]KCI relies on declarations filed in connection with its motion and briefing seeking dismissal of Innovative's original complaint. (D.I. 45 at 3, n.3)

Decl.)

The parties disagree as to whether Girouard had the apparent authority to speak to KCI's intentions regarding a possible patent infringement suit. According to Girouard's affidavit, he has been KCI's Director of Marketing for 14 years and, as Tumey would have understood from their long working relationship at KCI, Girouard was "not involved in making decisions regarding whether KCI will sue anyone." (D.I. 11, Girouard Decl. ¶¶ 1-3). Tumey states, to the contrary, that he believed that "as a KCI Director, Mr. Girouard would be in a position to understand KCI's current institutional attitude toward patent enforcement against competitive products." (D.I. 48, Tumey Decl. ¶ 7)

The affidavits further reveal a dispute as to Girouard's (and KCI's) information about Innovative and Innovative's products. Girouard states that he had never heard of Innovative before Tumey's and Meents' call. (D.I. 11, Girouard Decl. ¶ 11) He "was not aware of Mr. Tumey's two 510(k)s or his product before our conversation." *Id.* In contrast, Tumey states that Girouard admitted during the course of their phone conversation "that he was aware of one, but not two of the 510(k)s" Innovative had submitted to the FDA. (D.I. 48, Tumey Decl.¶ 8) According to Tumey, Girouard stated that "his awareness of one of the 510(k)s came from KCI's regular 'Competitive Intelligence' meetings." *Id.* Tumey's recollection is supported by Meents' affidavit.[4] (D.I. 48, Meents Decl. ¶¶ 4-6)

Both sides agree that during the telephone call Tumey described the Svedman device and asked Girouard to predict KCI's response to Innovative's planned launch of its product.

---

[4]Innovative has submitted Tumey's and Meents' "handwritten contemporaneous notes" from the call in support of their declarations. (D.I. 48 Exs. A & C)

Girouard recalls that he responded that KCI would view the Svedman and, if it determined that it infringed a KCI patent, "would probably take legal action." (D.I. 11, Girouard Decl. ¶ 10) Girouard further states that he thinks he "told Mr. Tumey that this would not be my determination in any event." *Id.* Tumey, on the other hand, recalls that Girouard replied to his question by stating, "KCI will act aggressively.  You know that." (D.I. 48, Tumey Decl. ¶ 12) Tumey's recollection is again supported by Meents. (D.I. 48, Meents Decl. ¶ 7)  Tumey and Meents both recall that Girouard predicted KCI would take legal action against Innovative, although both also state that Girouard qualified his opinion by adding that KCI would only sue "if it first determined that the product infringed the KCI patents." (D.I. 48, Meents Decl. ¶ 8 & Tumey Decl. ¶ 13)  Neither Tumey nor Meents remembers Girouard telling them that Girouard would not be the one to determine KCI's course of action. (D.I. 48, Meents Decl. ¶ 9 & Tumey Decl. ¶ 14)

Less than a week later, on or about September 17, 2007, Tumey telephoned his former supervisor, KCI Senior Vice President of Manufacturing and Executive Committee member Michael Burke, again in order to discuss a potential business relationship between the parties and assess the likelihood of an infringement suit by KCI. (D.I. 48, Tumey Decl. ¶ 15; D.I. 10, Burke Decl. ¶ 6)[5]  No one else was on the call.  Burke states that prior to the conversation he had never heard of Innovative and did not know that Tumey was working in the field of wound care. (D.I. 10, Burke Decl. ¶ 11)

Once again, the parties differ as to whether Tumey could have attributed to the KCI

---

[5]Burke subsequently retired from KCI on September 30, 2007. (D.I. 10, Burke Decl. ¶ 1)

officer he called the authority to speak for KCI on legal matters.  Burke states that his primary

responsibility at KCI was to oversee manufacturing operations and, thus, he had no involvement

in deciding whether or not KCI would sue a competitor.  *Id.*  Tumey responds that he believed

that as a vice president and member of KCI's Executive Committee, Burke was positioned to

"provide a realistic assessment of the KCI mind-set regarding enforcement of its patents against

competitive products."  (D.I. 48, Tumey Decl. ¶ 16)

      After describing the Svedman, Tumey asked Burke how he thought KCI would react to

the product's release.  Burke states that he replied he was "in no position to speak for KCI,

especially on legal issues," and went on to repeat a number of times that he "was not in the loop"

on such matters.  (D.I. 10, Burke Decl. ¶ 8)  Burke further states that in response to Tumey's

question whether he was "100% certain that KCI would sue" Innovative if the Svedman was

released, Burke told Tumey that he was "out of the loop" and did not know how KCI would

respond.  (D.I. 10, Burke Decl. ¶ 9)  Tumey, however, states that in answer to his question of

whether the likelihood of suit was 100%, Burke replied,"100% no doubt about it," and added that

any new product that "scratches the surface of [KCI's] patents" would be the subject of a KCI

lawsuit.  (D.I. 48, Tumey Decl. ¶ 19)[6]  Tumey denies that Burke ever said he was not in a

position to speak for KCI or that Burke "once, let alone repeatedly, stated that he was 'not in the

loop'" or made "equivalent statements suggesting that he had any doubts that KCI would act in

the manner that he described."  (D.I. 48, Tumey Decl. ¶ 22)  Tumey further declares that when he

attempted to explore whether the parties "could peacefully coexist," Burke immediately

---

      [6]Innovative has submitted Tumey's "handwritten contemporaneous notes" evidently taken
during the call as well as a typed summary he prepared shortly after the conversation.  (D.I. 48,
Tumey Decl. Exs. D & E)

dismissed the possibility.  (D.I. 48, Tumey Decl. ¶ 20)  Burke's affidavit does not comment on this point.

Filing Of The Original Complaint

On September 25, 2007, Innovative filed its original complaint against KCI in this Court, seeking a declaratory judgment of noninfringement and invalidity of each of KCI's five patents underlying the V.A.C.®  (D.I. 1)  KCI moved to dismiss the complaint on the ground that this Court lacks jurisdiction over its subject matter.  (D.I. 8)

Innovative Offers The Svedman For Sale

Innovative made its first offer for the sale of a Svedman device on September 27, 2007. (D.I. 18)  The first Svedman was sold during the first week of October 2007.  *Id.*

Events Subsequent To The Filing Of The Initial Complaint

On December 4, 2007, before briefing was complete on KCI's motion to dismiss the original complaint, Innovative allowed representatives from KCI to inspect its Svedman device and provided KCI with copies of its Users Manual and Instructions, pursuant to settlement negotiations.  (D.I. 36 ¶ 30)  On January 2, 2008, KCI filed suit in Texas state court against Innovative and three of its executives (Richard Vogel, David Tumey, and Mark Meents) who had formerly worked for KCI.  (D.I. 36 ¶ 36 & Ex. F)  KCI's Texas suit claims Innovative and its executives breached KCI confidentiality agreements and misappropriated KCI trade secrets.  On January 10, 2008, KCI and Wake Forest University brought a second action against Innovative,

this one for patent infringement in the Middle District of North Carolina.  (D.I. 36 ¶ 50 & Ex. H)

The North Carolina suit alleges that Innovative infringed three of the patents (the '643, '081, and

'651) at issue in the instant action.  (D.I. 36 ¶ 51)

On January 25, 2008, Innovative filed its first amended complaint in this Court, with

updated factual allegations reflecting KCI's actions in Texas state court and the Middle District

of North Carolina.  (D.I. 36)  The amended complaint also adds two counts alleging false

advertising/unfair competition and seeking a declaratory judgment that Innovative is the sole and

exclusive owner of the Svedman and related intellectual property.

On January 30, 2008, KCI withdrew its motion to dismiss the original complaint.

(D.I. 37)  On March 12, 2008, KCI filed the instant motion to dismiss Innovative's amended

complaint for lack of subject matter jurisdiction.  (D.I. 44)  In the alternative, KCI requests that

this action be transferred to the Middle District of North Carolina, where KCI's infringement suit

is currently pending.  *Id.*

## LEGAL STANDARDS

Federal Rule of Civil Procedure 12(b)(1) authorizes dismissal of a complaint for lack of

jurisdiction over the subject matter.  *See Samsung Elecs. Co. v. ON Semiconductor Corp.*, 2008

WL 900979, at *3 (D. Del. Apr. 3, 2008).  Motions brought under Rule 12(b)(1) may present

either facial or factual challenges to a court's subject matter jurisdiction.

> In reviewing a facial challenge under Rule 12(b)(1), the standards relevant to Rule
> 12(b)(6) apply.  In this regard, the Court must accept all factual allegations in the
> Complaint as true, and the Court may only consider the complaint and documents
> referenced in or attached to the complaint.  *Gould Electronics, Inc. v. United
> States*, 220 F.3d 169, 176 (3d Cir. 2000).  [In contrast, however,] [i]n reviewing a
> factual challenge to the Court's subject matter jurisdiction, the Court is not

confined to the allegations of the complaint, and the presumption of truthfulness does not attach to the allegations in the complaint. *Mortensen v. First Fed. Sav. & Loan*, 549 F.2d 884, 891 (3d Cir. 1997). Instead, the Court may consider evidence outside the pleadings, including affidavits, depositions and testimony, to resolve any factual issues bearing on jurisdiction. *Gotha v. United States*, 115 F.3d 176, 179 (3d Cir. 1997).

*Id.*

Here, because KCI attacks the factual basis for jurisdiction, the Court is not required to accept Innovative's allegations as true, but is instead "free to weigh evidence outside the pleadings to resolve factual issues bearing on jurisdiction and to satisfy itself as to the existence of its power to hear the case." *UD Technology Corp. v. Phenomenex, Inc.*, 2007 WL 28295, at *2 (D. Del. Jan. 4, 2007). Indeed, "[f]ederal courts are under an independent obligation to examine their own jurisdiction." *Pfizer, Inc. v. Elan Pharmaceutical Research Corp.*, 812 F. Supp. 1352, 1356 (D. Del. 1993) (internal quotation marks and citations omitted). "Once the Court's jurisdiction is challenged, the plaintiff bears the burden of proving that jurisdiction exists." *Samsung*, 2008 WL 900979, at *3.

## DISCUSSION

I.     There Was No "Actual Controversy" At
       The Time Innovative Filed Its Original Complaint

For declaratory judgment jurisdiction pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, to be present, there must be an "actual case or controversy" between the parties. *Medimmune, Inc. v. Genentech, Inc.*, 127 S. Ct. 764, 778 (2007). The case or controversy requirement in a declaratory judgment action is satisfied only if an actual case or controversy exists "in the constitutional sense." *Aetna Life Insurance Co. v. Haworth*, 300 U.S. 227, 240

(1937). A justiciable controversy in the constitutional sense "must be definite and concrete,

touching the legal relations of parties having adverse legal interests. It must be a real and

substantial controversy admitting of specific relief through a decree of conclusive character, as

distinguished from an opinion advising what the law would be upon a hypothetical state of

facts." *Id.* at 240-41.

In *Medimmune*, the Supreme Court held that jurisdiction over a declaratory judgment

action requires a dispute that is:

> definite and concrete, touching the legal relations of parties having adverse legal
> interests. It must be a real and substantial controversy admitting of specific relief
> through a decree of conclusive character, as distinguished from an opinion
> advising what the law would be upon a hypothetical state of facts. . . . Basically,
> the question in each case is whether the facts alleged, under all the circumstances,
> show that there is a substantial controversy, between parties having adverse legal
> interests, of sufficient immediacy and reality to warrant the issuance of a
> declaratory judgment.

127 S.Ct. 764 at 771 (emphasis added; internal citations omitted).

With *Medimmune*, the Supreme Court rejected what had been the Federal Circuit's

"reasonable apprehension of suit test" for determining whether jurisdiction existed in a

declaratory judgment patent suit.[7] In the wake of the *Medimmune* decision, the Federal Circuit

has acknowledged that "[t]he difference between an abstract question and a 'controversy'

---

[7]Prior to the Supreme Court's decision in *Medimmune*, the Federal Circuit applied a two-prong test for determining declaratory judgment jurisdiction, finding the existence of an actual controversy where there was both "(1) an explicit threat or other action by the patentee, which creates a reasonable apprehension on the part of the declaratory judgment plaintiff that it will face an infringement suit, and (2) present activity which could constitute infringement or concrete steps taken with the intent to conduct such activity." *Gen-Probe, Inc. v. Vysis, Inc.*, 359 F.3d 1376, 1380 (Fed. Cir. 2004) (internal quotation marks omitted). Following *Medimmune*, the Federal Circuit has recognized that the "reasonable apprehension of suit test is no longer a necessary criterion for declaratory judgment jurisdiction." *Micron Tech, Inc. v. Mosaid Tech, Inc.*, 518 F.3d 897, 902 (Fed Cir. 2008).

contemplated by the Declaratory Judgment Act is necessarily one of degree, and it would be

difficult, if it would be possible, to fashion a precise test for determining in every case whether

there is such a controversy." *Sony Electonics, Inc. v. Guardian Media Technologies, Ltd.*, 497

F.3d 1271, 1283 (citation omitted).

The Federal Circuit's recent decisions have, however, provided some guidance in

elaborating on the *Medimmune* standard.  In *Teva Pharms. USA, Inc. v. Novartis Pharms. Corp.*,

the Court held that a "controversy is ripe if the question presented is . . . entirely or substantially

a question of law and postponing a decision would work a substantial hardship on the

challenging party."  482 F.3d 1330, 1337 (Fed. Cir. 2007) (internal citation and quotation marks

omitted).  Most significantly, in *SanDisk Corp. v. STMicroelectronics, Inc.*, the Federal Circuit

explained:

> [D]eclaratory judgment jurisdiction generally will not arise merely on the basis
> that a party learns of the existence of a patent owned by another or even perceives
> such a patent to pose a risk of infringement, without some affirmative act by the
> patentee.  But Article III jurisdiction may be met where the patentee takes a
> position that puts the declaratory judgment plaintiff in the position of either
> pursuing arguably illegal behavior or abandoning that which he claims a right to
> do. . . .  We hold only that where a patentee asserts rights under a patent based on
> certain identified ongoing or planned activity of another party, and where that
> party contends that it has the right to engage in the accused activity without
> license, an Article III case or controversy will arise and the party need not risk a
> suit for infringement by engaging in the identified activity before seeking a
> declaration of its legal rights.

480 F.3d 1372, 1380-81 (Fed Cir. 2007) (emphasis added; internal citation omitted).

Innovative's original complaint identifies the following evidence that, Innovative asserts,

establishes subject matter jurisdiction under *Medimmune's* "all the circumstances" standard as of

the date this action was filed: KCI's "consistent[] and aggressive[]" history of litigation seeking

to enforce its patent rights with respect to the V.A.C.® device; KCI's 10-K report filed with the

12

Securities and Exchange Commission, which notes that if the company is "unsuccessful in protecting and maintaining our intellectual property, particularly our rights under the Wake Forest patents, our competitive position would be harmed;" KCI's awareness that Innovative received FDA approval for its own negative pressure wound therapy device, based on 510(k) submissions that cited as predicate devices either KCI's V.A.C.® or products of competitors that KCI had sued for patent infringement; and the telephone statements from KCI officers "expressly warn[ing] [Innovative] of the likelihood that they [KCI] will sue [Innovative] for patent infringment." (D.I. 1 ¶¶ 18- 20)

Missing from this recitation is any allegation of an "affirmative act" by KCI directed toward Innovative that could meet the requirement set out by the Federal Circuit in *SanDisk*. Innovative argues that no "affirmative act" is required to establish declaratory judgment jurisdiction because, according to Innovative, neither the Supreme Court in *Medimmune* nor the Federal Circuit in *SanDisk* or any other case has established a requirement of an affirmative act. (D.I. 57 at 19-21) I disagree.

Innovative's first argument essentially asks me to tell the Federal Circuit it misunderstood the Supreme Court's *Medimmune* decision. But Federal Circuit precedent governs district courts with respect to subject matter jurisdiction issues in patent suits, *see Minnesota Mining & Mfg. Co. v. Norton Co.*, 929 F.2d 670, 672 (Fed Cir. 1991), so the Federal Circuit's interpretation of *Medimmune* is binding on this Court. Innovative's second argument is also incorrect. *SanDisk* speaks repeatedly of a patentee having to commit an "affirmative act" or "take[] a position or "assert[] rights under a patent" in order for there to be declaratory judgment jurisdiction. 480 F.3d at 1380-81. This thrice-stated requirement is, I think, just that: a requirement that *action* be

taken by the patentee in order for an actual controversy between the parties to exist. While it is true that *SanDisk* says declaratory judgment jurisdiction "generally" will not arise without some affirmative act by the patentee, *id.*, the Federal Circuit did not explain on what basis this general requirement would be excused and I see no reason to treat the instant case as *sui generis* in that regard.

Innovative's related claim that the Federal Circuit has not required an affirmative act in cases subsequent to *SanDisk* (D.I. 57 at 21) is also unpersuasive. These cases, while not invoking the "affirmative act" language per se, are fully in keeping with the *SanDisk* requirement since both cases plainly involved obvious affirmative acts by the patentee. *See Micron*, 518 F.3d at 898 (patentee "sent a warning letter strongly suggesting that [plaintiff] should license [patentee's] technology" and three follow-up letters); *Sony*, 497 F.3d at 1274-76 (patentee sent plaintiff series of letters alleging infringement, including detailed charts listing each patent claim alleged to be infringed).

In the alternative, Innovative contends that the statements made by Girouard and Burke on the phone to Tumey constitute the requisite affirmative act. (D.I. 57 at 22) However, even taking as true Tumey's and Meents' version of the phone calls Tumey placed to KCI's Girouard and Burke, the KCI officers' statements do not satisfy the affirmative act requirement. Girouard merely stated that KCI was aware of one of Innovative's two 510(k) submissions and had discussed this submission at a KCI Competitive Intelligence meeting; he also expressed his opinion that KCI would "act aggressively" upon Innovative's launch of the Svedman. (D.I. 48, Tumey Decl. ¶¶ 8, 11-13 & Meents Decl. ¶ 8) As Tumey details, however, Girouard was speaking only of possibilities (i.e., what KCI would do if it concluded the Svedman infringed),

not affirmatively asserting rights on KCI's behalf. Tumey declares: "When I asked Mr. Girouard whether this meant that KCI would sue if we launched this product [i.e., the Svedman], he responded that KCI would take legal action, but clearly indicated that such action would take place only after KCI determined that the product infringed the KCI patents." (D.I. 48, Tumey Decl. ¶ 13) (emphasis added)

The situation is similar with Burke. Burke rejected the possibility that KCI and Innovative "could peacefully coexist." (D.I. 48, Tumey Decl. ¶ 20) He answered Tumey's question as to whether the chances of a KCI infringement suit against Innovative were 100% by stating, "100% no doubt about it." (D.I. 48, Tumey Decl. ¶ 19) But, according to Tumey, Burke also "clarified this point by adding that any product that 'scratches the surface of our patents' would be the subject of a lawsuit." *Id.* While Burke's remarks were less equivocal than Girouard's, they nevertheless left a degree of contingency that render them something less than an "affirmative act" of the type required by *SanDisk*. This is especially so because at the time Burke made these comments, neither he nor anyone at KCI had seen the Svedman or measured it against KCI's patents. As far as the record reveals, no one at KCI had reached even a tentative conclusion as to whether the Svedman infringed KCI's patents.

Therefore, even assuming that Girouard and Burke had at least apparent authority even to speak for KCI on patent-related issues, I conclude that, under all the circumstances, the comments made by KCI's officers on calls initiated by Innovative do not constitute KCI taking an affirmative act or "tak[ing] a position" or even "assert[ing] rights under a patent." *SanDisk*, 480 F.3d at 1380-81; *see also Baker Hughes Oilfield Operations, Inc. v. Reedhycalog UK, Ltd.*, 2008 WL 345849 at *2-3 (D. Utah Feb. 6, 2008) (dismissing action seeking declaratory judgment

of noninfringement, invalidity, and unenforceability of patents due to lack of "affirmative act" by patentee, even though patentee had sent plaintiff numerous letters evidencing that patentee was evaluating possible infringement litigation against plaintiff). It follows that there was no actual controversy between Innovative and KCI as of the date Innovative filed its original complaint and, thus, declaratory judgment jurisdiction was lacking at that time.

II.     Events Occurring Subsequent To The Filing Of The Original
        Complaint Cannot Cure The Previous Lack Of An Actual Controversy

The allegations in Innovative's amended complaint do set out affirmative acts by KCI of the kind required to demonstrate the existence of an actual controversy between the parties. For instance, the amended complaint includes the allegations that KCI sued Innovative for patent infringement relating to the Svedman device. (D.I. 36 ¶¶ 36-53) Innovative insists that even if the original complaint is deficient, the amended complaint cures any defects.

Innovative is incorrect. It is well-settled that the burden is on the declaratory judgment plaintiff to "establish that such jurisdiction existed at the time the claim for declaratory relief was filed and that it has continued since." *Benitec Australia, Ltd. v. Nucleonics, Inc.*, 495 F.3d 1340, 1344 (Fed Cir. 2007). "[L]ater events may not create jurisdiction where none existed at the time of filing" of the complaint. *GAF Building Materials Corp. v. Elk Corp. of Dallas*, 90 F.3d 479, 483 (Fed Cir. 1996) (internal citation omitted). Indeed, the Supreme Court's recent statement regarding diversity jurisdiction is equally applicable here: "It has long been the case that the jurisdiction of the court depends upon the state of things at the time of the action brought. This time-of-filing rule is hornbook law (quite literally) taught to first-year law students in any basic course on federal civil procedure." *Grupo Dataflux v. Atlas Global Group, L.P.*, 541 U.S. 567,

16

570-71 (2004) (internal quotation marks, footnote, and citation omitted).

Nevertheless, Innovative insists that "a supplemental pleading that includes additional facts that occurred after the filing of the original pleading may cure a jurisdictional defect." (D.I. 58 at 1)[8] Although Innovative cites several cases in supposed support of this proposition, *see, e.g.,* D.I. 48 at 10-11; D.I. 58 at 1-2, none of these cases – nor any others the Court has located – involve courts permitting premature (i.e., pre-actual controversy) declaratory judgment patent actions to be saved by a supplemental pleading incorporating events that occurred after the filing of the original complaint.[9]

By contrast, KCI has cited multiple cases, including one from this district, in which courts

---

[8]Innovative never sought leave to file a "supplemental" complaint – to add allegations of events occurring after the filing of the original complaint, *see* Fed. R. Civ. Proc. 15(d) – and instead filed an "amended" complaint – which should only have added allegations of events that had occurred prior to the filing of the original complaint, *see Abbott Diabetes Care, Inc. v. Dexcom, Inc.*, 2006 WL 2375035, at *4 (D. Del. Aug. 16, 2006). Whether I can dismiss on that ground is an issue I do not reach. Instead, I treat Innovative's filing as if it were a proper supplement instead of an amendment.

[9]*See Mathews v. Diaz*, 426 U.S. 67, 75 & n.9 (1976) (permitting, pursuant to 28 U.S.C. § 1653, declaratory judgment plaintiff in social security case to supplement complaint to add that he had filed claim for benefits before filing suit; Supreme Court later explained, in *Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 831 (1989), that § 1653 only permits supplemental pleadings to fix "incorrect statements about jurisdiction that actually exists, and not defects in the jurisdictional facts themselves"); *Snyder v. Pascack Valley Hospital*, 303 F.3d 271, 276 (3d Cir. 2002) (articulating general principle that an "amended complaint supersedes the original version in providing the blueprint for the future course of a lawsuit"); *Black v. Secretary of Health and Human Services*, 93 F.3d 781 (Fed Cir. 1996) (holding that plaintiff pressing claim for compensation under National Childhood Vaccine Injury Act could supplement petition to add allegation he had incurred the requisite threshold expenses within statute of limitations period, even if some of those expenses were incurred after filing of initial petition); *Intrepid v. Pollack*, 907 F.2d 1125, 1129 (Fed Cir. 1990) (finding, in case in which jurisdiction had existed at and since time of filing of original complaint, that district court abused its discretion in not permitting plaintiff to supplement complaint to include challenge to post-complaint finding of International Trade Administration).

have rejected precisely what Innovative proposes be done here. *See Fairplay Elec. Cars, LLC v. Textron Innovations, Inc.*, 431 F.Supp.2d 491, 493 (D. Del. 2006) (holding that declaratory judgment plaintiff could not rely on letter from patentee – implicitly alleging infringement – to create jurisdiction since letter was sent after plaintiff had filed suit); *see also Baker Hughes*, 2008 WL 345849, at *3 ("Events that transpired after filing cannot operate to create jurisdiction at the time of filing."); *Monsanto Co. v. Syngenta Crop Protection, Inc.*, 2008 WL 294291, at *7 (E.D. Mo. Jan. 31, 2008) (same). I agree with KCI's cases, as they are consistent with the "hornbook law" cited above. Indeed, to reach the contrary conclusion, and allow a supplemental pleading to cure a jurisdictional defect that existed at the time the original complaint was filed, would invite a declaratory judgment plaintiff in a patent cases to file suit at the earliest moment it conceives of any potential benefit to doing so, confident it will either draw an infringement suit in response (thereby retroactively establishing jurisdiction over their first-filed declaratory judgment suit) or will suffer no adverse consequence other than having its suit dismissed.

Accordingly, an actual controversy between Innovative and KCI needs to have existed at the time Innovative filed its original complaint. As previously explained, it did not. That an actual controversy arose shortly after Innovative's original filing does not cure the jurisdictional defect that existed at the time of the original filing. Therefore, subject matter jurisdiction is lacking and Innovative's action should be dismissed.

18

**RECOMMENDED DISPOSITION**

For the reasons set forth above, I recommend that Defendants' motion to dismiss be

GRANTED.

Dated: July 14, 2008

Honorable Leonard P. Stark
UNITED STATES MAGISTRATE JUDGE